# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 342 | **DATE** | 3/29/2002 |
| **CASE TITLE** | Security First Network Bank vs. C.A.P.S., Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. the court denies in part and grants in part Security First's motions to dismiss Saks' counterclaim and C.A.P.S.' counterclaim [#44] [#76] [#79] as set forth herein, denies Security First's motion for reimbursement of its attorneys' fees and costs from the interpleader funds [#54] and grants LaSalle Bank's and C.A.P.S.' motion to dismiss Security First's complaint for interpleader with prejudice [#64] [#68]. The $70,000 in Remaining Debit Proceeds are to be distributed to Saks and C.A.P.S. in the proportion set forth in the court's April 10, 2001 disbursement order. Status hearing is set for 4/25/02 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 11 number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 29 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 94 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/29/2002 | |
| MD | courtroom deputy's initials | 02 MAR 29 PM 4:04 Date/time received in central Clerk's Office | date mailed notice MD mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SECURITY FIRST NETWORK BANK | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 01 C 342 |
| | ) |
| C.A.P.S., INC., an Illinois Corporation, | ) |
| ABN AMRO, INC., a New York Corporation, | ) |
| THE LASALLE BANK, THE NORTHERN | ) |
| TRUST COMPANY, a Delaware Corporation, | ) |
| SAKS FIFTH AVENUE, INC., a | ) |
| Massachusetts Corporation, MARVIN L. | ) |
| GOLDMAN, and JOSEPH V. SYKES a/k/a | ) |
| MARVIN L. GOLDMAN | ) |
| | ) |
| Defendants. | ) |

DOCKETED
MAR 2 9 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff, Security First Network Bank ("Security First"), filed an interpleader action in

the Northern District of Georgia on September 19, 2000. On defendants' motion for a transfer of

venue, the case was transferred to this court on January 17, 2001. Subsequently, several

defendants filed counterclaims and cross-claims. Presently before the court are various motions

of the parties, which the court addresses below.

### BACKGROUND[1]

The parties in this case, in some way or another, seek to recover for or be absolved of the

alleged fraudulent act of Joseph V. Sykes ("Sykes"), a resident of Florida. Security First is a

national banking association chartered under the laws of the United States with its principal place

---

[1]The facts set forth in this section are taken from the parties' pleadings and information provided by the docket, unless otherwise specified herein.

1



of business in Georgia. On or about December 28, 1999, Sykes, using the name "Marvin L. Goldman" opened an account (the "Goldman account") at Security First. Marvin L. Goldman is also a resident of Florida. Security First was unaware of Sykes' real identity at that time. Using the name "Marvin L. Goldman," Sykes debited, or attempted to debit, accounts held at various financial institutions, including The Northern Trust Company ("Northern Trust") and LaSalle Bank National Association ("LaSalle Bank"), and transfer the debited funds into the "Goldman account." Northern Trust is a Delaware corporation with its principal place of business in Illinois. LaSalle Bank is a national banking association chartered under the laws of the United States with its principal place of business in Illinois.

One of the accounts debited was Consolidated Artist's Payroll Service, Inc.'s ("C.A.P.S.") account #30175914 at Northern Trust. C.A.P.S., an Illinois corporation located in Cook County, utilizes electronic fund transfers to provide payroll services to its customers throughout the United States. Northern Trust, in establishing and servicing C.A.P.S.' account #30175914, utilizes the Automated Clearing House ("ACH") network. The ACH network is a national electronic payment system which allows pre-authorized credits and debits to be automatically posted as a means to electronically transfer funds to and from banks' customers' accounts.

The other account debited was Saks, Incorporated's ("Saks") payroll account #559-0019500 at LaSalle Bank. Saks is a Tennessee corporation with its principal place of business in Alabama and is a holding company for several retail department stores including Saks Fifth Avenue and Carson Pirie Scott. Saks and Northern Trust had an ACH agreement under which Saks initiated ACH debits and credits to its accounts at LaSalle Bank. Their agreement

incorporated the rules promulgated by the National Automated Clearing House Association ("NACHA"), which govern banks that participate in the ACH network.

To accomplish the debit transfers, Sykes submitted to Security First numerous recurring ACH transfer requests from Northern Trust and LaSalle Bank. With each ACH transfer request, Sykes presented a void check from the account which was to be debited, with the name "M.L. Goldman" printed on the check. From January 7, 2000 through January 13, 2000, Sykes successfully transferred over $1,500,000.00 into the "Goldman account" ($900,000.00 from Saks' account and $525,000.00 from C.A.P.S.' account). He transferred approximately $508,455.00 of that amount to third parties.

On January 14, 2000, after certain ACH transfer requests had been rejected by the financial institutions at which the accounts to be debited were located, Security First began investigating Sykes and the "Goldman account" and learned that the "Marvin L. Goldman" who had opened the account and directed the debits was actually Sykes and that Sykes had procured and fraudulently used data relating to the real Marvin L. Goldman in order to open an account at Security First and commit fraud. Security First froze the "Goldman account" which contained, at the time, approximately $900,000.00 (the "Remaining Debit Proceeds").

According to C.A.P.S. and Saks, neither of them authorized the debit transfers. They further assert that although Security First discovered Sykes' fraudulent scheme in January, 2000, it failed to timely notify them or their banks of the unauthorized debit entries. C.A.P.S. first discovered the unauthorized debits in April, 2000 and demanded that Northern Trust credit its account. Northern Trust advised C.A.P.S. that the loss would be "dealt with accordingly" and that Northern Trust would recover the funds from Security First. At some point in May, 2000,

3

Northern Trust contacted Security First and demanded it satisfy C.A.P.S.' claim. Security First refused, pointing to the strict time limits in the NACHA rules for the return of a debit by a receiving bank such as Northern Trust.[2] At some point, Saks also discovered the unauthorized debits and demand was made on Security First in August, 2000 for return of the money that had been debited from Saks' account, but Security First refused.

C.A.P.S. filed suit against Northern Trust in the Circuit Court of Cook County in June, 2000. Northern Trust informed Security First that if Security First failed to indemnify Northern Trust for C.A.P.S.' claims in the state action, it would file a third-party complaint against Security First. On September 18, 2000, Northern Trust filed a third-party complaint against Security First in state court. A day later, on September 19, 2000, Security First filed a two-count complaint for interpleader pursuant to 28 U.S.C. §§ 1335, 2361 in the District Court for the Northern District of Georgia, interpleading the defendants herein. In its complaint, Security First sought to deposit the Remaining Debit Proceeds in the registry of the court for the benefit of the claimants, sought an injunction restraining defendants/other claimants from proceeding with litigation affecting the interpleader funds, sought a declaration that Security First be "discharged and have no further liability to any of the defendants . . . arising from the transactions at issue" and requested attorneys' fees and costs in connection with the interpleader action.

After being served with the interpleader action, defendants (except Sykes and Goldman) sent a letter to Security First, dated October 16, 2000, advising that they had agreed to an equitable distribution of the funds and requested that it be distributed accordingly. They

---

[2](*See* Security First's Reply to Certain Defs.' Opp. to its Claim to Interpleader Funds, at 3.)

proposed a consent order in which Security First would be protected against claims by any of the defendants to the funds, but would not be relieved of any liability for claims arising out of matters which gave rise to the interpleader action. On November 15, 2000, defendants in the interpleader action filed various motions, including a motion to dismiss for lack of jurisdiction and for failure to state claim and a motion to transfer venue. On December 26, 2000, Security First moved to deposit the interpleader funds. Also, on December 26, 2000, defendants sent another letter proposing settlement. On January 9, 2001, Security First responded to both letters explaining that it did not think Saks or C.A.P.S. had claims against Security First based on the unauthorized debits and that they could only lay claim to the interpleaded funds. Security First offered, however, to release the funds to the defendants provided they "release [Security First] from any further claims or demands."[3]

On January 9, 2001, the district court for the Northern District of Georgia granted defendants' motion to transfer venue and on January 17, 2001 the case was transferred to this court. On February 2, 2001, certain defendants opposed the motion to deposit interpleader funds. On February 20, 2001, Saks filed a counterclaim against Security First and cross-claim against LaSalle Bank, asserting as an independent basis of jurisdiction, the diversity statute, 28 U.S.C. § 1332. That same day, the court granted Security First's motion to deposit interpleader funds. On March 14, 2001, the court entered an order to deposit the interpleader funds into the registry of the court and ordered that upon payment, Security First would be discharged and relieved of obligations in connection with the management or disposition of the funds during the time the funds are deposited with the court. On March 15, 2001, Security First deposited $960,140.46

---

[3](*See, e.g.*, C.A.P.S.' Mem. in Opp. to Security First's Claim to Interpleader Funds and exhibits thereto.)

into the registry of the court.

On March 20, 2001, Saks and C.A.P.S. made a joint motion for disbursement of the interpleader funds in which they agreed that the entire amount of interpleader funds should be proportionally divided between them (neither LaSalle Bank nor Northern Trust objected) and claimed that no other party was entitled to share in the funds. The court granted their motion on March 27, 2001. Also on March 27, Security First moved to dismiss Saks' counterclaim. Shortly thereafter, on April 2, 2001, Security First moved to vacate the court's order disbursing the interpleader funds, arguing that Saks and C.A.P.S. continued to dispute the court's jurisdiction, that neither Saks nor C.A.P.S. had yet filed a claim or proven that they were rightfully entitled to the funds, that there was no provision to prevent others (*e.g.*, Sykes and Goldman) from making a claim to the funds, and that Security First was entitled to have its attorneys' fees and costs reimbursed from the funds. The court stayed its disbursement order until April 10, 2001, to resolve these matters.

On April 10, 2001, the court found that it had jurisdiction by way of Saks' counterclaim and cross-claim and had supplemental jurisdiction over the remaining claims and parties, ruled that defendants' earlier motions to dismiss (filed November 15, 2000, regarding challenges to jurisdiction, etc.) were moot and entered an order on Count I of the interpleader complaint, requiring disbursement of 67% of the funds to Saks and 33% to C.A.P.S., reserving $70,000.00 attributable to Security First's claim for attorneys' fees, and enjoining others from making claims to the interpleader funds (except the $70,000.00). On April 17, 2001, Security First moved for reimbursement of its attorneys' fees and costs from the $70,000.00, which certain defendants have opposed. In May 2001, LaSalle Bank and C.A.P.S. moved to dismiss the complaint for

interpleader and C.A.P.S. filed a counterclaim against Security First and a cross-claim against Northern Trust. Northern Trust and LaSalle Bank also filed counterclaims against Security First. Security First moved to dismiss C.A.P.S.' counterclaim in June, 2001.

## DISCUSSION

Presently before the court are the following motions: Security First's motions to dismiss Saks' counterclaim and C.A.P.S.' counterclaim [#44] [#76] [#79], Security First's motion for reimbursement of its attorneys fees and costs from the interpleader funds [#54] and LaSalle Bank's and C.A.P.S.' motion to dismiss Security First's complaint for interpleader [#64] [#68]. The court addresses each in turn and recites additional background facts as necessary to each motion. As this court already determined, it has diversity jurisdiction by way of Saks' counterclaim and exercises supplemental jurisdiction over the remaining claims.

I.     SECURITY FIRST'S MOTIONS TO DISMISS[4]

Before recounting the specific allegations of each of Saks' and C.A.P.S.' counterclaims, the court sets out the framework for an ACH transaction. There are typically five participants in an ACH transaction: (1) the originating company or individual ("Originator"); (2) the Originating Depository Financial Institution ("ODFI"); (3) the ACH Operator; (4) the Receiving Depository Financial Institution ("RDFI"); and (5) the receiving company or individual ("Receiver"). (2000 ACH Rules, An ACH Primer, at 1.) For an ACH transaction to occur, the Receiver must authorize an Originator to initiate an ACH entry to the Receiver's account with the RDFI. The

---

[4]In briefing the motions to dismiss, the parties have not raised or addressed the choice of law issue and all parties – Security First, Saks and C.A.P.S. – rely primarily on Illinois law in their briefs. Therefore, the court presumes that the substantive law of Illinois governs. *Kritikos* v. *Palmer Johnson, Inc.*, 821 F.2d 418, 421 (7th Cir. 1987) ("When the parties fail to consider the choice of law in a diversity case, the substantive law of the forum is presumed to control.") (quotation omitted).

Originator agrees to initiate ACH entries into the payment system according to its arrangement with a Receiver. The ODFI receives payment instructions from the Originator. The ODFI then forwards the entry to the ACH Operator, which is the central clearing facility operated by a private organization or a Federal Reserve Bank on behalf of DFIs, to or from which DFIs transmit or receive ACH entries. The RDFI receives the ACH entry from the ACH Operator and posts the entry to the account of its depositor (the Receiver). (*Id.* at 2.)[5] *See also* 2000 NACHA Operating Rule § 13.1 (Definitions).

Saks alleges that although Saks never authorized Sykes to debit its account, Sykes (the Originator) fraudulently initiated a debit entry to transfer funds from Saks' (the Receiver's) account to the "Goldman account." Saks alleges Sykes originated two debit transfers, one on January 11 and the other on January 13, 2000 in the amount of $450,000.00 each, from Saks' account #559-0019500 to the "Goldman account." Saks alleges that the debit transfers were originated through Security First, the ODFI, using Saks' account number but wrongfully naming the account holder as "Marvin Goldman" and that LaSalle Bank, the RDFI, debited Saks' account pursuant to Security First's instruction. Saks alleges that Security First failed to require proper identification from Sykes, failed to verify "Goldman's" real identity and failed to conduct any background investigation. As a result, Saks alleges that Security First is liable to it for negligence, breach of warranties under the Illinois Uniform Commercial Code, 810 ILCS 5/4-207(a) and 4-208(a), and for breach of warranty under the 2000 NACHA Operating Rules.

---

[5]Unlike a check, which is always a debit instrument, an ACH entry may be either a debit or credit entry depending upon the effect to the Receiver's account: if the Receiver's account is debited, it is an ACH debit, if the Receiver's account is credited, it is an ACH credit. (ACH Primer, at 2.) A common ACH debit transaction occurs where a company or individual pays recurring bills, such as such as mortgage payments, by allowing their accounts to be debited by the authorized Originator (the entity to whom the monthly payment is owed). (*Id.* at 4.)

8

C.A.P.S. alleges Sykes originated three debit transfers, one on January 7, one on January 11 and another on January 13, 2000, in the amount of $175,000.00 each, from C.A.P.S' account #30175914 to the "Goldman account." The debit transfers were originated through Security First, the ODFI, using C.A.P.S.' account number but wrongfully naming the account holder as "Marvin Goldman." Northern Trust, the RDFI, debited C.A.P.S.' account pursuant to Security First's instruction. C.A.P.S. alleges that Security First failed to properly investigate and verify the identity of "Goldman" and failed to immediately notify Northern Trust and C.A.P.S. when it first learned of the unauthorized debit transfers. As a result, C.A.P.S. alleges that Security First is liable to it for breach of Security First's duty to exercise ordinary care under the Illinois Uniform Commercial Code, 810 ILCS 5/4-103, breach of warranties under the Illinois Uniform Commercial Code, 810 ILCS 5/4-207(a) and 4-208(a), and for violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 5/505-2.

Security First's moves pursuant to Federal Rule of Civil Procedure 12(b)(6) for dismissal of Saks' and C.A.P.S.' counterclaims against it. A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *General Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957); *Kennedy* v. *Nat'l Juvenile Det. Assoc.*, 187 F.3d 690, 695 (7th Cir. 1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999); *Zemke* v. *City of Chicago*, 100

F.3d 511, 513 (7th Cir. 1996).

## A. Saks' Claims Against Security First

<u>NACHA Claim</u>

In Count IV of its counterclaim, Saks brings a claim against Security First for breach of the NACHA Operating Rule warranties. As already noted herein, Saks alleged that it entered into an agreement with LaSalle Bank for ACH services and that agreement incorporated the NACHA Operating Rules. As such, Saks claims it is entitled to enforce the NACHA rules against Security First. The NACHA Operating Rules "apply to all entries and entry data transmitted through one or more ACH Operators," NACHA Operating Rule § 1.1, and "[e]ach participating DFI agrees to comply with these rules[.]" *Id.* § 1.2. A prerequisite to origination is that the "Receiver had authorized the Originator to initiate the entry to the Receiver's account." *Id.* § 2.1.2. Under the rules, the "ODFI . . . warrants . . . to each RDFI, ACH Operator, and Association . . . [that] each entry transmitted by the ODFI to an ACH Operator is in accordance with the proper authorization provided by the Originator and the Receiver." *Id.* § 2.2.1.1.

Saks argues that Security First, by issuing a debit to LaSalle Bank for Saks' account, warranted that Saks had properly authorized that debit. Saks further points to NACHA Operating Rule § 2.2.3, which provides, "[e]ach ODFI breaching any of the preceding warranties shall indemnify every RDFI, ACH Operator, and Association from and against any and all claim, demand, loss, liability, or expense, including attorneys' fees and costs, that result directly or indirectly from the breach of warranty or the debiting or crediting of the entry to the Receiver's account. . . ." and argues that because Saks did not authorize the debit, Security First is liable to it for breach of warranty.

10

Security First concedes that Saks has alleged it (Saks) is a party to the NACHA rules,[6] but argues that Saks cannot enforce the warranty provisions since they run only from ODFIs to RDFIs, ACH Operators, and Associations, and not to receivers, like Saks. While the court agrees that enforcement of § 2.2.3 would not get Saks anywhere since that provision is an agreement *to indemnify* an RDFI, ACH Operator or Association for the breach of the warranty in § 2.2.1.1, enforcement of Security First's warranty in § 2.2.1.1, would. When a person "warrants" something, he "promise[s] that a certain fact or state of facts, in relation to the subject-matter, is, or shall be, as it is represented to be." BLACK'S LAW DICTIONARY, at 1585 (6th ed. 1990). Had Security First not broken its promise in § 2.2.1.1 to LaSalle Bank that the debits were authorized, then Saks' account would not have been improperly debited. Because Saks is a party to the rules, bound by its obligations as well as entitled to its benefits, it can enforce this provision, even though the provision applies only to an obligation from one bank to another. *Cf. Sinclair Oil Corp.* v. *Sylvan Bank*, 894 F. Supp. 1470, 1477-78 (D. Kan. 1995) (holding that a customer (Originator), which had a contract with the ODFI incorporating the NACHA rules, could enforce against defendant RDFI bank the NACHA return of entry provision that *required the RDFI to make deposits with the ACH/reserve bank* by deadlines established by the ACH) (emphasis added).[7] Because Saks has adequately alleged a direct claim against Security First for breach of

---

[6]Security First notes that NACHA rules require only the Originator to enter into a contract with the ODFI to be bound by the NACHA rules, NACHA Operating Rule § 2.1.1, and there is no such requirement for the Receiver. Security First does not, however, argue that the Receiver, Saks, could not have voluntarily agreed to be bound by the rules by way of an agreement with its bank.

[7]Although not raised by Saks, it would seem Saks could also rely on a breach of § 2.1, "Origination of Entries," specifically subsection 2.1.2 requiring the Receiver's authorization ("The following must occur before an Originator may initiate the first credit or debit entry to a Receiver or to a Receiver's account with an RDFI: * * * The Receiver has authorized the Originator to initiate the entry to the Receiver's account."). If, as the parties concede, the NACHA rules are a contract, and one of the contract provisions is that a condition for origination is the Receiver's authorization, if the entry is not authorized by the Receiver, as here, a plaintiff could make a claim for

warranty, it does not address Saks' third-party beneficiary argument.

<u>UCC Claims</u>

Saks also brings claims against Security First under Article 4 of the Illinois UCC. In Count II, Saks asserts a claim for breach of transfer warranty under 810 ILCS 5/4-207, which provides that "[a] customer or collecting bank that transfers an item and receives a settlement or other consideration warrants to the transferee and to any subsequent collecting bank that: . . . the warrantor is a person entitled to enforce the item[.]" 810 ILCS 5/4-207(a)(1). Saks claims that under this provision, Security First warranted to Saks that Security First and Sykes were entitled to enforce the debit transfers, that all signatures were authentic and authorized and the item was not altered. Saks alleges that because Security First, as the originating depository financial institution, debited Saks' account with fraudulent and unauthorized transfers, Security First breached the transfer warranty of section 4-207(a). In Count III, Saks asserts a claim for breach of presentment warranty under 810 ILCS 5/4-208, which provides,

> If an unaccepted draft[8] is presented to the drawee for payment or acceptance and the drawee pays or accepts the draft, (i) the person obtaining payment or acceptance, at the time of presentment, and (ii) a previous transferor of the draft, at the time of transfer, warrant to the drawee that pays or accepts the draft in good faith that: (1) the warrantor is or was, at the time the warrantor transferred the draft, a person entitled to enforce the draft or authorized to obtain payment or acceptance of the draft on behalf of a person entitled to enforce the draft[.]

810 ILCS 5/4-208(a)(1). Saks claims that under this provision, Security First presented Sykes' fraudulent transfer draft to Saks to obtain payment and, in so doing, warranted under section 4-

---

breach of contract for this provision presumably against any of the parties to the transaction under the NACHA rules. Then, of course, the allocation of risk of loss is as set by NACHA Operating Rule, § 2.2.3.

[8]A "draft" is defined as "item . . . that is an order." 810 ILCS 5/3-104(e).

208, that it and Sykes were entitled to obtain payment, the draft was not altered and it had no knowledge that the transfer was unauthorized. Saks alleges that because Security First, as the originating depository financial institution, debited Saks' account with fraudulent and unauthorized transfers, it breached the presentment warranty of section 4-208(a).

As an initial matter, Security First argues that Saks cannot base a claim on the UCC because the Seventh Circuit and other courts have found that Article 4 of the UCC is inapplicable to electronic funds transfers. *See Evra Corp.* v. *Swiss Bank Corp.*, 673 F.2d 951, 955 (7th Cir. 1982); *Fernandes* v. *First Bank & Trust Co.*, No. 93 C 2903, 1993 WL 339286 (N.D. Ill. Sept. 3, 1993) (Kocoras, J.) (declining to apply UCC to wire transfer based on *Evra* and because of UCC's express exclusion of payment orders governed by Article 4A (Funds Transfers) or a credit or debit card slip). Although there is no Illinois case specifically finding the Illinois UCC inapplicable to electronic *debit* transactions as opposed to an electronic funds transfer, at least one state court that addressed the issue followed the lead of the electronic funds transfer cases and rejected the applicability of the UCC to an ACH debit transaction. *See Sinclair Oil Corp.* v. *Sylvan Bank*, 869 P.2d 675, 680-81 (Kan. 1994).

By not interposing contrary authority, Saks appears to concede that the UCC, standing alone, does not offer a basis for recovery. Saks argues, however, that because it is a party to the NACHA rules, and NACHA Operating Rule § 13.1.20 expressly incorporates Article 4 to debit entries, Saks can resort to applicable UCC provisions, such as the UCC warranties in sections 4-207 and 4-208. NACHA Operating Rule § 13.1.20, provides that a "debit entry shall be deemed an 'item' within the meaning of Revised Article 4 . . . and that Article shall apply to such entries except where the application is inconsistent with these rules, in which case these rules shall

13

control." Security First replies that no case has relied on § 13.1.20 and explains that § 13.1.20's reference to the UCC was put into the NACHA rules at their inception as a gap-filler in the event courts found the NACHA rules incomplete.

The one case brought to the court's attention involving both NACHA and UCC did not directly address the issue now before this court. On a certified question from a Kansas federal court to the Kansas Supreme Court regarding whether the NACHA return of entry deadline modified the Kansas UCC deadline (and thus whether the defendant bank could be liable to plaintiff under UCC as modified by NACHA), as just discussed, *supra*, the Kansas Supreme Court held that the UCC did not apply to electronic ACH debit transactions. *See Sinclair Oil Corp.*, 869 P.2d at 680-81. Once back in the federal court, the federal court noted that because the Kansas Supreme Court had held that the UCC does not apply to electronic debits, plaintiff was not claiming "any statutory authority governing return of the electronic debit items." *Sinclair Oil Corp.* v. *Sylvan Bank*, 894 F. Supp. 1470, 1476 (D. Kan. 1995). The federal court, however, held that plaintiff could recover against defendant bank directly under the NACHA rules for the defendant bank's failure to meet the NACHA deadlines if plaintiff could prove that it was a party to the NACHA rules by way of its agreement with its bank. Because the UCC provision in *Sinclair* did not really give the plaintiff any additional benefit than that received by direct application of the NACHA rules, the court did not need to reach Rule § 13.1.20's incorporation of Article 4.

Here, as in *Sinclair*, Saks seek to recover from Security First directly under the NACHA rules for breach of Security First's promise to transmit only authorized entries. Because the court concludes that it can state such a claim, it need not reach the question of what effect § 13.1.20's

incorporation of UCC warranties would have. To apply two warranties, though not necessarily inconsistent, would appear to be duplicative.[9] Thus, the court dismisses Saks' UCC claims.

## Negligence Claim

In Count I, Saks brings claims against Security First for negligence under Illinois law. To state a claim for negligence, plaintiff must plead, (1) defendant owed him a duty of care; (2) the defendant breached that duty; and (3) the breach was the proximate cause of his injuries. *Staples* v. *Krack Corp.*, 186 F.3d 977, 979 (7th Cir. 1999) (citing *Ward* v. *K Mart Corp.*, 136 Ill. 2d 132, 554 N.E.2d 223, 226 (Ill. 1990)). Security First argues that Saks' negligence claim fails for three reasons: Saks has not adequately alleged a duty on the part of Security First to Saks, Saks has not adequately alleged that Security First's alleged negligence proximately caused Saks' damages, and Saks cannot recover damages in tort because it seeks only economic loss and, thus, its negligence claimed is barred by the *Moorman* doctrine.

Although the court would likely find that Saks had adequately alleged a duty and proximate causation, it agrees with Security First that the negligence claim is barred by the *Moorman* doctrine. The "economic loss" rule was laid down by the Illinois Supreme Court in *Moorman Mfg. Co.* v. *Nat'l Tank Co.*, 91 Ill.2d 69, 435 N.E.2d 443 (Ill. 1982). *Moorman* was a products liability case, in which the Illinois Supreme Court held that a plaintiff may not recover solely economic losses under tort theories of negligence or strict liability. *Id.* at 449-50. Subsequently, the Illinois Supreme Court applied the economic loss rule to claims that services

---

[9]Section 13.1.20, in short, says that a debit entry means an item for purposes of Article 4, and Article 4 protections are incorporated into the parties' agreement unless they are inconsistent with NACHA rules. Either the Article 4 provision is (1) consistent with NACHA rules, in which case it is superfluous, (2) inconsistent, in which case it does not apply, or (3) fills a void in the NACHA rules, in which case it does apply. Thus, the court agrees with Security First that § 13.1.20 appears to be a gap-filler, providing a remedy where there are no applicable NACHA rules and the application would not be inconsistent with other NACHA rules.

were performed negligently. *See Anderson Electric, Inc.* v. *Ledbetter Erection Corp.*, 115 Ill. 2d 146, 503 N.E.2d 246 (Ill. 1986). In *Anderson*, the Illinois Supreme Court held that a plaintiff seeking to recover for purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract. *Id.* at 249. The Illinois Supreme Court has recognized only three exceptions to the economic loss rule: (1) where the plaintiff sustained damage, i.e. personal or property damage, resulting from a sudden or dangerous condition; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, i.e. fraud; and (3) where the plaintiff's damages are caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 680 N.E.2d 265, 275 (Ill. 1997) (explaining *Moorman*).

Saks argues that the *Moorman* doctrine is inapplicable to this case because it is not seeking to recover for any "economic loss" addressed in *Moorman* (i.e. it is not seeking compensation for some injury, such as expectation damages or lost profits), but is seeking only "direct damages" – compensation for the loss of its money. Saks points to *Evra*, 673 F.2d at 955, where the Seventh Circuit recognized the difference between "direct damages" (loss of deposited funds) and "consequential damages." However, the Seventh Circuit in *Evra* was addressing whether a plaintiff, whom the district court had held could recover from a bank under a negligence theory, could hold the defendant bank liable (because it was reasonably foreseeable) for consequential damages. *Id.* at 955-58. The Seventh Circuit did not discuss *Moorman*, which had been decided on February 19, 1982, subsequent to the district court's ruling on May 12, 1981.

16

The court concludes that because the only damages Saks seeks are those resulting from defeated expectations of its contract with LaSalle Bank which incorporated the NACHA rules, its negligence claim is barred by the *Moorman* doctrine. The contract, as Saks alleges, is for the posting of ACH credits and debits to its account. As a party to the NACHA rules, by which Security First is also bound, the parties' (including Saks') commercial expectations were that only authorized debits would be processed from Originators to Receivers. Because Saks is seeking to recover for a failure of that expectation to materialize, even if it did result in the loss of its own property (money from its account), the property loss was merely caused by its disappointed commercial expectations. *See Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 441 N.E.2d 324 (Ill. 1982) (Economic loss rules applies to loss of property due to disappointed expectations.); *see also Nextel v. Argentina, S.R.L. v. Elemar Int'l Forwarding, Inc.*, 44 F. Supp. 2d 1306, 1309 (S.D. Fla. 1999) (holding that Florida's economic loss rule barred plaintiff from recovering in tort theory against forwarder who had agreed to personally supervise transportation of cellular phones, but contrary to its agreement, hired another entity to transport the phones and the shipment of cellular phones was stolen). Therefore, the court dismisses Saks' negligence claim.

### B. C.A.P.S.' Claims Against Security First

<u>UCC Claims</u>

C.A.P.S. makes the same arguments with respect to UCC, sections 4-207 and 4-208 as Saks and adds a claim for breach of good faith and ordinary care under UCC, section 5/4-103 (essentially making a negligence argument). Because the court has concluded that Article 4 of the UCC does not offer a statutory basis for recovery where electronic transactions are involved,

the court dismisses C.A.P.S.' UCC claims. If C.A.P.S. would like to amend its counterclaim to allege a claim under NACHA it may do so.[10]

### Illinois Consumer Fraud and Deceptive Practices Act

The Illinois Consumer Fraud and Deceptive Practices Act prohibits, *inter alia*, "omission of any material fact, with intent that others rely upon the concealment . . . in the conduct of any trade or commerce" where the plaintiff "has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. To establish a claim under the Act, plaintiff must show: (1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce. *Cozzi Iron & Metal, Inc.* v. *U.S. Office Equip., Inc.*, 250 F.3d 570, 576 (7th Cir. 2001) (citing *Connick* v. *Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 675 N.E.2d 584, 593 (Ill. 1996)). Plaintiff need not prove either knowledge on the part of defendant of the omission (an innocent omission will do) or actual reliance by the plaintiff, *see Thacker* v. *Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1997), but plaintiff still must prove that the omission was material and proximately caused her injuries. *Cozzi*, 250 F.3d at 576 (citing *Connick*, 174 Ill. 2d 482, 675 N.E.2d at 593). Likewise, where plaintiff is relying on a concealment claim, he must plead that defendant remained silent under circumstances which created a duty to speak. *Mackinac* v. *Arcadia Nat'l Life Ins. Co.*, 271 Ill. App. 3d 138, 648 N.E.2d 237, 240 (1st Dist. 1995).

C.A.P.S. alleges that Security First became aware of Sykes' fraud in January, 2000, but failed to alert Northern Trust or C.A.P.S. of the fraudulent transfers or of the possibility of the

---

[10]Apparently anticipating such a result, C.A.P.S. requested in its briefs, that to the extent the court finds the UCC inapplicable, it be permitted to amend its counterclaim to state a claim under, *inter alia*, the NACHA rules.

fraudulent transfers until three months later. C.A.P.S. points out that under NACHA Operating Rule § 5.1.2, which requires that "each return entry must be received by the RDFI's ACH Operator by its deposit deadline for the return entry to be made available to the ODFI no later than the opening of business on the second banking day following the Settlement Date of the original entry," had Security First notified Northern Trust or C.A.P.S. of the fraudulent scheme at the time it discovered it, the fraudulent debit transfers could have been reversed by Northern Trust and C.A.P.S.' account would have been credited the full amount of the transfer at Security First's expense. C.A.P.S. asserts that by concealing and failing to notify either of them until the deadline passed, Security First, pursuant to NACHA rules, had the option of not crediting C.A.P.S.' account. C.A.P.S. further alleges that Security First intended that C.A.P.S. rely on the nondisclosure so that the NACHA verification time period lapsed in hopes that it would not be obligated to refund the money under the NACHA rules. C.A.P.S. alleges such nondisclosure caused its damages.

Security First replies that it became aware of the fraud on January 14, 2000, five days after the first transfer, three days after the second and one day after the first, and thus C.A.P.S. cannot prove it would be entitled to automatic crediting (prior to two day settlement date), at least with respect to the first two debits. However, Security First's knowledge is a question of fact that this court does not decide on a motion to dismiss.[11] The court concludes C.A.P.S. has

_____

[11]C.A.P.S.' reference to Security First's pleading does not preclude C.A.P.S. from asserting claims based on the first two debits since C.A.P.S.' complaint, while referencing by "see" Security First's complaint, alleges discovery of the fraud in January, 2000. The court also rejects Security First's argument that C.A.P.S., by referencing the Andrew Hinely affidavit in its complaint (which Security First argues shows no concealment on the part of Security First because Hinely called Northern Trust on January 14, 2000), has pled facts showing that there was no concealment. The extent of Security First's knowledge and disclosure are factual issues not appropriate for a motion to dismiss.

19

alleged a claim under the Illinois Consumer Fraud and Deceptive Practices Act.

## II.    SECURITY FIRST'S CLAIM TO REMAINING INTERPLEADER FUNDS

Security First seeks to recover its attorneys' fees and costs from the $70,000.00 held back by the court in its order disbursing the Remaining Debit Proceeds to Saks and C.A.P.S. Under federal law,[12] the district court has discretion to award a disinterested stakeholder its attorneys' fees and costs when it is fair and equitable to do so. *Rhoades v. Casey*, 196 F.3d 592, 603 (5th Cir. 1999); *Minn. Mut. Life Ins. Co. v. Gustafson*, 415 F. Supp. 615, 617 (N.D. Ill. 1976); *Northern Trust Co. v. Meineke*, No. 90 C 938, 1991 WL 65929, *1 (N.D. Ill. Apr. 22, 1991) (Parsons, J.). Normally, courts will award fees to a disinterested stakeholder who deposits the disputed fund with the court. *Minn. Mut. Life Ins.*, 415 F. Supp. at 617 (citation omitted). The rationale for such an award is generally three-fold. First, courts reason that where the existence of conflicting claims to the funds is not due to the fault of the stakeholder, the stakeholder should not have to pay the fees in order to guard itself against harassment. Second, the stakeholder, by promptly initiating an interpleader action, furthers judicial economy by bringing all claimants into one forum so that their claims to the funds may be resolved and particularly benefits the prevailing claimant by guaranteeing its immediate satisfaction without the need for judgment execution proceedings. Finally, the award of attorneys' fees are usually nominal and thus are of

---

[12]Saks asserts that state law of Illinois governs, relying on *Aetna Life Ins. Co. v. Johnson*, 206 F. Supp. 63 (N.D. Ill. 1962). *Aetna* held that attorneys' fees relates to the substantive rights in an interpleader action and, therefore, the *Erie* doctrine precludes any discretion on behalf of federal courts and they must follow the law of the state (the law of Illinois does not allow attorneys' fees to a party filing an interpleader action). *Id.* at 66. However, many courts that have evaluated the choice of law issue have taken a different approach and find *Erie* inapplicable. *See, e.g., Minn. Mut. Life Ins. Co. v. Gustafson*, 415 F. Supp. 615, 616 (N.D. Ill. 1976); *Interstate Life Assurance Co. v. Sedlak*, No. 83 C 5246, 1985 WL 1595, *3 (N.D. Ill. May 29, 1985) (Grady, J.); *see also* CHARLES ALAN WRIGHT ET AL, 7 FEDERAL PRACTICE & PROCEDURE 3d § 1719 (2002). The court agrees with those authorities that find *Erie* inapplicable to the interpleader setting and, therefore, applies federal law.

little consequence to the fund. *See id.* 617-18 (citing, *inter alia, Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp.,* 306 F.2d 188, 193 (9th Cir. 1962) and commentary); *see also Meineke,* 1991 WL 65929, at *1. Some courts award only a portion of the attorneys' fees, however, on the ground that the stakeholder, too, is benefitted from not having to resist a multiplicity of suits in different jurisdictions by various claimants to the funds. *Minn. Mut. Life Ins.,* 415 F. Supp. at 618 (citation omitted).

Security First argues it is entitled to $69,158.82[13] of the $70,000.00, for administering the interpleader funds for over a year (approximately January, 2000 when it froze funds, to March 15, 2001 when it deposited them in registry of court) and for seeking to resolve the rightful ownership to the funds through an interpleader action, while defending against numerous motions filed by defendants resisting the efficient adjudication of the funds' ownership. Defendants oppose Security First's request in its entirety. The court concludes that Security First is not entitled to have its attorneys fees and costs paid out the fund. None of the rationales for the exercise of the court's discretion to impress the fund for a disinterested stakeholder's efforts are applicable to this case. Security First is not a "disinterested" stakeholder, since, as discussed *supra,* Security First, in sending unauthorized debits, could be liable to defendants for the alleged fraudulent act of its customer, Sykes. *See Hughes Supply, Inc.* v. *A.C. Elec. Corp. of Lee County,* 145 F.R.D. 590, 594 (M.D. Fla. 1993) (denying motion for attorneys' fees reasoning that interpleader plaintiff was not disinterested party where one of the defendant's alleged that it could garnish from the plaintiff more than the amount interpleaded into court and stating that if

---

[13]Security First seeks approximately $17,821.00 for the labor of the Alston & Baird law firm in Atlanta, Georgia from September, 2000 through November, 2000 and $51,337.82 from Rogers & Hardin, also a Georgia firm, which took over in December, 2000.

the "allegations of the misappropriation of funds [are] valid, [plaintiff] would be an interested party by operation of law"). Security First's filing (on the heals of Northern Trust's third-party action against it in C.A.P.S.' Illinois action) of its interpleader action, which seeks, *inter alia*, a declaration that Security First has no further liability to any of the defendants "arising from the transactions at issue," and its refusal to settle the litigation unless it received such a release, further supports the court's conclusion that it was motivated by its own self interest. *Cf. Cogan v. United States*, 659 F. Supp. 353, 354 (S.D. Miss. 1987) (denying attorneys' fees where stakeholder interpleaded funds into court registry in response to insured's declaratory judgment action against it).

Second, Security First did not further prompt resolution of the claims to the funds. According to Security First's own pleading, its investigation begun in January, 2000, resulted in discovery of Sykes' fraud on at least two different accounts and his transfer of a portion of the funds to third parties, yet Security First has provided the court no plausible explanation as to why, in light of its assertion that it (Security First) had no claim to the funds, it did not bring the interpleader action sooner for the benefit of the potential claimants.[14] *In re OEM Indus. Corp.*, 135 B.R. 247, 250 (Bankr. W.D. Pa. 1991) (denying attorneys' fees and costs because of interpleader plaintiff's delay in bringing action even though it had been aware of claims); *see also New York Life Ins. Co. v. Bidoggia*, 15 F.2d 126 (D. Idaho 1926). When Security First finally did bring the interpleader action in September, 2000, resolution was further delayed

---

[14]Even if Northern Trust, C.A.P.S.' bank, told Security First's Andrew Hinely that Goldman was a signatory of C.A.P.S.' account on or about January 14, 2000 (and, therefore, apparently under Security First's theory, C.A.P.S.' had authorized Goldman to debit its account), Security First admits that its investigation revealed that Sykes had procured and fraudulently used data relating to Goldman; thus, the fact that Goldman may be a signatory to C.A.P.S.' account appears irrelevant to whether Security First should have brought an interpleader action earlier.

because of Security First's rejection of the claimants' agreement to divide the funds. Indeed, shortly after the interpleader complaint was filed, it became apparent that there was no continuing real threat of adverse claims to the funds in light of the parties' agreement to distribute the funds proportionally. *Cf. Paul Revere Life Ins. Co.* v. *Riddle*, 222 F. Supp. 867, 868 (E.D. Tenn. 1963) (Although plaintiff had right to maintain action in interpleader to avoid vexation of resisting claims to funds even if it believed that some of the claims were not meritorious, where there is serious doubt that other claimants might make claims to the funds, the right to bring an interpleader action does not "include the further right to impress the fund with the expense of interpleading it.").[15]

Finally, the request is not for a nominal amount for preparing a simple interpleader action, filing costs, and other administrative tasks. True, the increase in costs is due in part to Security First having to defend against motions brought by defendants, but it appears to the court that the litigation over the interpleader action, as a whole, was the result of the other factors at work, above described, which situation Security First helped to create. Therefore, the court denies Security First's request for attorneys' fees and costs from the fund.

III. LASALLE BANK'S AND C.A.P.S.' MOTION TO DISMISS

LaSalle Bank and C.A.P.S. move pursuant to Federal Rule of Civil Procedure 12(b)(6) for dismissal of Security First's complaint for interpleader. They claim the court's April 10, 2001 order to disburse funds is a resolution of Count I of the interpleader action, that Count II's request for an injunction is merely a prayer for the relief requested in Count I, and that the

---

[15]Although Security First suggests that Sykes and Goldman were potential claimants, not only was this highly unlikely due to Sykes' fraud, which Security First admits it discovered, but the remoteness of this possibility is further evidenced by Security First's acknowledgment that it has been unable to serve these parties.

request for attorneys fees and costs is only collateral to this claim. Security First does not dispute that Count II is merely a prayer for relief for Count I and relies only upon the existence of the attorneys fees issue as a basis for not dismissing the complaint. Because the court has already determined the attorneys' fees issue, there is nothing left to decide on the interpleader complaint and it is, therefore, dismissed with prejudice.

## CONCLUSION

For the reasons set forth herein, the court denies in part and grants in part Security First's motions to dismiss Saks' counterclaim and C.A.P.S.' counterclaim [#44] [#76] [#79] as set forth herein, denies Security First's motion for reimbursement of its attorneys' fees and costs from the interpleader funds [#54] and grants LaSalle Bank's and C.A.P.S.' motion to dismiss Security First's complaint for interpleader with prejudice [#64] [#68]. The $70,000 in Remaining Debit Proceeds are to be distributed to Saks and C.A.P.S. in the proportion set forth in the court's April 10, 2001 disbursement order.

Date: March 29, 2002

Enter: _Joan H Lefkow_

JOAN HUMPHREY LEFKOW
United States District Judge